```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,      )
                                    )
 4        v.                        )   Docket No. 5:18-CR-722-OLG
                                    )
 5   (1) ERNESTO GUTIERREZ-MARTINEZ,)   San Antonio, Texas
                                    )   December 11, 2018
 6        Defendant.                )   10:20 a.m. to 11:34 a.m.
     _____)
 7
          TRANSCRIPT OF DETENTION HEARING (WITNESS TESTIMONY ONLY)
 8            BEFORE THE HONORABLE ELIZABETH S. CHESTNEY
                  UNITED STATES MAGISTRATE JUDGE
 9
     A P P E A R A N C E S:
10
     FOR THE GOVERNMENT:
11        UNITED STATES ATTORNEY'S OFFICE
          By:  Charles Jenkins, Esquire
12        601 N.W. Loop 410, Suite 600
          San Antonio, TX  78216
13
     FOR THE DEFENDANT:
14        LAW OFFICE OF DAVID E. DILLEY, PLLC
          By:  David E. Dilley, Esquire
15        5255 San Pedro Avenue
          San Antonio, TX  78212-1218
16
     COURT RECORDER:  FTR Gold
17
     TRANSCRIBER:
18        CHRIS POAGE
          655 East Cesar E. Chavez Blvd., Suite G-65
19        San Antonio, TX  78206
          Telephone:  (210) 244-5036
20        chris_poage@txwd.uscourts.gov

21   Proceedings reported by electronic sound recording.  Transcript
     produced by computer-aided transcription.
22

23

24

25
```

1                              INDEX

2                                                        PAGE

3    CHRISTOPHER BENAVIDES

4    Direct Examination by Mr. Jenkins ........................4

5    Cross-Examination by Mr. Dilley ........................16

6    Redirect Examination by Mr. Jenkins ....................36

7    Recross-Examination by Mr. Dilley ......................39

8    JONATHAN MORGAN

9    Direct Examination by Mr. Jenkins ......................39

10   Cross-Examination by Mr. Dilley ........................46

11   Voir Dire Examination by Mr. Jenkins ...................57

12   Cross-Examination (Continued) by Mr. Dilley ............57

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Open court at 10:20 a.m.)

2               THE COURT:  You may be seated.

3               COURTROOM DEPUTY:  Court calls the following case:

4     United States of America versus Ernesto Gutierrez-Martinez,

5     Case Number SA:18-CR-722.

6               THE COURT:  I'll have appearances, please.

7               MR. JENKINS:  Good morning, Your Honor.  Charles

8     Jenkins here for the United States.

9               THE COURT:  Good morning.

10              MR. DILLEY:  Good morning, Your Honor.  David Dilley

11    on behalf of Mr. Gutierrez.

12              THE COURT:  Good morning.

13         We are here today this morning on Mr. Gutierrez' -- well,

14    it's a detention hearing.  Essentially, we've got the waiver of

15    arraignment.

16         And, Mr. Jenkins, just as a preliminary matter, you don't

17    dispute that we sort of start afresh on the question of

18    detention, and it's still the government's burden to prove --

19              MR. JENKINS:  No.  That's fine.  I'm ready to proceed.

20              THE COURT:  Okay.  You can call your first witness.

21              MR. JENKINS:  Agent Christopher Benavides, please.

22         (The oath was administered)

23              THE COURT:  Good morning.

24

25

1     CHRISTOPHER BENAVIDES, GOVERNMENT'S WITNESS, SWORN

2                  DIRECT EXAMINATION

3   BY MR. JENKINS:

4   Q.  Good morning, sir.  Will you state your name and occupation

5   for the record.

6   A.  Yes, sir.  My name is Christopher Benavides.  I'm employed

7   with the Bureau of Alcohol, Tobacco and Firearms.

8   Q.  And how long have you been employed by ATF?

9   A.  Approximately 20 years.

10  Q.  Are you one of the -- I guess I'd call you one of the two

11  primary case agents in the -- in this matter involving Ernesto

12  Gutierrez?

13  A.  Yes, sir.  That's correct.

14  Q.  And are you familiar with the background of how the

15  investigation started and proceeded prior to Mr. Gutierrez'

16  arrest in May of this year?

17  A.  Yes, sir.  I'm familiar with that.

18  Q.  And are you familiar with the followup investigation that

19  has occurred subsequent, or after, the May 22nd arrest?

20  A.  I'm also familiar with that as well.

21  Q.  Okay.  In this particular case how did Mr. Gutierrez first

22  come to the attention of investigators?

23  A.  Here, in May of 2018 we had received some information

24  regarding a Texas Gun Trader online firearms ad, and where an

25  individual had made a request to purchase a large caliber, .50

1   caliber rifle for sale and wanted to pay cash for that.

2   Q.   Okay.  Just by way of background, can you -- for the record

3   is Texas Gun Trader an online firearms exchange market?

4   A.   Yes.  The best way to kind of look at it, it's like an eBay

5   for firearms.  And the individuals are what we call private

6   sellers, and they're trying to sell their firearms or

7   ammunition online.  And as long as you have an account and the

8   username, you can go on there and make a bid and purchase a

9   firearm.

10  Q.   Okay.  And this was a solicitation from a potential buyer

11  saying they wanted to buy a .50 caliber rifle; is that right?

12  A.   Correct, which is a little different than -- most

13  individuals on the website are -- actually have a firearm to

14  sell, and they're looking for inquiries to purchase it from

15  them.

16       In this particular instance the individual who had the ad

17  posted was looking for a particular firearm and was looking for

18  inquiries if you had any to sell.  So it was the other way

19  around.

20  Q.   And can you describe for the Court what a .50 caliber rifle

21  is?

22  A.   A .50 caliber rifle is a large-calibered rifle round,

23  predominantly used through military to create large damage in

24  walls or vehicles in order to disable them.  They run

25  approximately anywhere from 8,000 to $15,000 per rifle.

1   Q.   Okay.  And is this a rifle that can be used as sort of a

2   long-range sniper rifle?

3   A.   Yes, sir.  It can have that with some scoping optics on top

4   of it.  If an individual chose to do that, it's a long-range

5   rifle as well.

6   Q.   Okay.  To the best of your knowledge is this the kind of

7   gun that's used for hunting or sporting purposes other than to

8   target practice?

9   A.   Mostly it's just targeting, but predominantly it's in war

10  theaters.  Like I said -- mentioned, to break holes in walls,

11  to break holes in vehicles and small armored tanks and stuff

12  like that.

13  Q.   Based upon your experience as an ATF agent, is this a gun

14  that's desired by drug cartels and criminals south of the

15  border in Mexico?

16  A.   Most definitely.  There's been a trend since 2017, starting

17  earlier, all the way to the present date, that all the cartels,

18  not a particular one, have all been seeking to acquire .50

19  caliber rifles, not specific on the manufacturer, but that type

20  of caliber.  And the reason they're using that is also to shoot

21  down helicopters from the Mexican military that would be

22  following the convoys for the cartels.

23  Q.   Okay.  And was that one of the reasons that this

24  solicitation, this online, you know, offer to purchase drew

25  your attention?

1    A.   It did, because we were already working several

2    investigations regarding .50 caliber rifles.  And at the time

3    we did not know if this particular inquirer was part of those

4    other ongoing cases.  So there was an interest to ATF.

5    Q.   Okay.  Did the solicitation have a name associated -- a

6    username or contact information?

7    A.   It had a cellphone number that was attached to the bottom

8    of the ad.

9    Q.   Okay.  And did you do some additional followup on that

10   cellphone number?

11   A.   We most certainly did, yes, to attempt to identify possibly

12   who the owner of it or the user of that cellphone is.

13   Q.   Okay.  And were you able to identify the user of the

14   cellphone?

15   A.   Yes, we were.

16   Q.   And who's that?

17   A.   That was a Mr. Ernesto Gutierrez, who's in court at the

18   defense table right now.

19   Q.   Thank you.

20       At some point in the investigation did someone reach out to

21   this potential purchaser in an undercover capacity and offer to

22   sell them one or more .50 caliber rifles?

23   A.   Yes.  We used an ATF confidential informant in order to

24   make an attempt to engage Mr. Gutierrez in discussions about

25   what his intentions would be with the purchase of this rifle.

1  Q.  Okay.  And during the course of these under -- these

2  contacts, did this confidential informant make references to

3  people in Mexico wanting these guns and the export of these

4  kind of guns?

5  A.  Yes.  It's not an assumption by the government to believe

6  that anybody that would make an inquiry for purchasing one

7  would be involved in criminal activities.

8       So the informant advised the would-be buyer, Mr. Gutierrez,

9  that the .50 cal. that was in his possession and available for

10 sale had been actually purchased for a cartel and was not

11 acquired by them, and this was available to him.  So he

12 initially knew that the firearm that would be available was

13 already for a Mexican cartel.

14      And further discussions with Mr. Gutierrez, also said that

15 more could be acquired through what's called a straw purchaser,

16 which somebody who would lie on the form to get more .50

17 caliber rifles for him.

18 Q.  So you're saying the CI at one point offered, Hey, I can

19 have someone go make false statements to buy additional .50

20 cals if you want them?

21 A.  That's correct.  And the reason why that was offered to

22 Mr. Gutierrez is during that first discussion with the

23 informant he actually requested additional .50 caliber rifles

24 that he would be interested in purchasing beyond the one that

25 the CI had available for sale.

1    Q.  Okay.  And despite these references to illegal purchases,

2    that sort of thing, did Mr. Gutierrez continue to express an

3    interest in buying .50 caliber rifles from the undercover?

4    A.  That's correct.  He also asked for ammunition for this type

5    of rifle and wanted to have it expedited as far as these

6    purchases as soon as possible.

7    Q.  So on May 22nd of 2018 was a meeting arranged for the --

8    this confidential informant to deliver the .50 caliber rifle to

9    Mr. Gutierrez?

10   A.  Yes, sir.  It was an operation on that date.

11   Q.  Okay.  And safe to say you didn't allow the gun to be

12   handed over and potentially exported to Mexico?

13   A.  No, sir.  The informant, along with another undercover ATF

14   agent, engaged Mr. Gutierrez at that time in a public parking

15   lot here in San Antonio.  He did transfer currency in

16   furtherance of acquiring that rifle, and then he was field

17   contacted by law enforcement about his intentions on that

18   purchase.

19   Q.  Okay.  Now, just to clear up, were you aware of

20   Mr. Gutierrez' immigration status during the course of the

21   investigation?

22   A.  Yes, sir.  We learned that earlier, when we first

23   identified who he was.  And I believe he's considered a legal

24   permanent resident.

25   Q.  Okay.  And is it -- is it lawful for a legal permanent

1    resident, an LPR, to purchase and own and carry a firearm?

2    A.   It is available for somebody underneath that status to be

3    able to purchase one --

4    Q.   Okay.

5    A.   -- and possess them lawfully.

6    Q.   All right.  On the 22nd did you take possession -- did you

7    seize an iPhone and some other materials from Mr. Gutierrez?

8    A.   Yes, sir.  We were able to seize $10,000 in currency,

9    wrapped up in rubber bands, multiple bank deposit slips that

10   were in a briefcase that was in the vehicle and strewn

11   around -- it's what we call "pocket trash" in the car -- and

12   the cellphone that we just mentioned.  Those were seized at

13   that time.

14   Q.   All right.  And did you consult with the U.S. Attorney's

15   office about next steps to take in the investigation?

16   A.   Yes, sir.  Most certainly we did.

17   Q.   And was a decision made to get a search warrant for that

18   iPhone, to read the contents of the iPhone?

19   A.   That's correct.  In our training/experience multiple

20   digital devices are used in furtherance of facilitating

21   criminal activity.  And in this instance we believed that there

22   was several red flags that had been raised up during our UC

23   communications with Mr. Gutierrez.  So we did seek out and

24   applied for and did get a search warrant for that phone.

25   Q.   Okay.  And which agency executed the extraction, the

1  exportation of the phone?

2  A.  HSI, Homeland Security Investigations, is joint on this

3  case, and they assisted us in that.

4  Q.  Okay.  Was Mr. Gutierrez released after his detention that

5  day?

6  A.  He was.  He was detained at the time.  He did come back to

7  the ATF office, provided a very short statement, which again

8  gave us more reason to question what he was doing buying that

9  day.  And he was released without incident at that time.

10  Q.  Okay.  And was he charged with any crime on May 22nd?

11  A.  No, sir, not at that time.  The vehicle was released to

12  him, and we said we would communicate with him in the future.

13  And that was how it was left.

14  Q.  Okay.  In addition to the cash, the bank receipts, the

15  phone, were there also two firearms found in Mr. Gutierrez'

16  vehicle that day?

17  A.  Yes, sir.  One was in the back seat area, and one was

18  staged on the door of the vehicle.  As soon as you opened and

19  swung it open, there was a loaded firearm on the driver's side

20  of the vehicle.

21  Q.  Okay.  Now, because no charges were filed at that time,

22  were those guns eventually turned over to Mr. Gutierrez'

23  attorney?

24  A.  Yes, they were.  ATF -- unless there is going to be charges

25  on these particular firearms, and there wasn't at the time, we

1    were able to communicate with his attorney, and we did return

2    those to the attorney, who I believe got them back to

3    Mr. Gutierrez.

4    Q.  Okay.  Following the May 22nd operation, did you -- did you

5    conduct some followup investigation on Mr. Gutierrez and the

6    circumstances of his gun purchase?

7    A.  Yes, we did.  And it had to do with the phone extraction

8    and the search warrant that was executed.  Not only did we do

9    that, we started looking at Mr. Gutierrez' border crossings and

10   did he have any travels down to the border?  He had a residence

11   here in San Antonio.  But just -- you know, just because

12   someone lives here doesn't necessarily mean they have

13   crossings.

14       But what we did find is multiple monthly crossings through

15   different ports of entry along the southwest Texas border.

16   Q.  Okay.  You mentioned his residence here in San Antonio.

17   Following May 22nd, did you have occasion to go by his

18   residence to check to see whether or not he appeared to be

19   there?

20   A.  Yes, sir.  It's common for us, as the investigation

21   continues, whether an individual is arrested or not arrested,

22   in order to see if he's still maintaining residency at the

23   house that's listed on his driver's license.  And during those

24   times we noticed that there was now a for sale sign sometime in

25   June of 2018 shortly after that field contact with us in May,

1    22nd.

2    Q.  Okay.  And on any of these occasions did you ever actually

3    see Mr. Gutierrez at the house?

4    A.  We never had seen Mr. Gutierrez.  And the vehicles that we

5    knew for him, which was a white Ford -- I'm sorry -- a white

6    Honda Accord and a black-colored GMC SUV were no longer

7    present, where in the past they had been there.  So they were

8    no longer seen there anymore.

9    Q.  Okay.  Was there a silver BMW that you occasionally saw at

10   the house after the May 22nd operation?

11   A.  Yes, sir.  I believe it was a 323i, and seemed to always be

12   parked.  We didn't know if it was functioning or working, but

13   it always seemed to be parked outside, where you could see it.

14   Q.  Okay.  Among the items that were seized at the time of the

15   May 22nd operation or at the time -- well, was Mr. Gutierrez

16   subsequently indicted by the federal grand jury?

17   A.  Yes, sir.  After the July 31st extraction and review and

18   analysis, which was conducted by Homeland Security, there was

19   an indictment after the review of that information.

20   Q.  Okay.  And was a warrant requested for Mr. Gutierrez'

21   arrest as part of that indictment return?

22   A.  Yes.  Yes, sir, it was.  It was here out of the Western

23   District of Texas.

24   Q.  Okay.  And from that point forward, did you make attempts

25   to locate Mr. Gutierrez, see if you could find him at the house

1    or whether he was crossing the border?

2    A.   I communicated with Homeland Security in order to see if

3    there had been crossings since the field contact.  We did not

4    see as many crossings as we had in the past.  But we did notice

5    what's called plate readers, license plate readers; that the

6    vehicles for him were what we call hitting on the —— hitting

7    the readers down south in the McAllen, Edinburg, Brownsville

8    area of Texas.  It was unknown if he was driving that vehicle,

9    but his vehicles were traveling down south.

10   Q.   So on October 30th were you contacted and told that

11   Mr. Gutierrez had been arrested while crossing the border back

12   into the U.S.?

13   A.   Yes.  I was aware of that incident.

14   Q.   And did you —— did you —— did you —— where was that?  In

15   Hidalgo, Texas?

16   A.   Yes, sir, the Hidalgo port of entry.  Yes, sir.

17   Q.   Okay.  Now, did you go down there at the time, or did you

18   later receive other materials that were seized from

19   Mr. Gutierrez at the time of his arrest?

20   A.   No.  The ATF and Homeland Security office handled the

21   arrest of Mr. Gutierrez down there.  It was subsequent to that

22   arrest that our local office received additional digital

23   evidence seized within that vehicle ——

24   Q.   Okay.

25   A.   —— which was the white Honda Accord.

1  Q.  All right.  Among the -- and have you -- you've received

2  those materials that were -- that were picked up on October

3  30th as well?

4  A.  The ones that I'm able to examine without a search warrant.

5  And what I mean is that there was additional bank deposit

6  slips, again pocket trash like we had mentioned on the May 22nd

7  field contact.  And that included more large cash deposits at

8  several banks, both in San Antonio and along the southwest

9  border, under $10,000 for those transactions.  And my

10  training/experience shows that to possibly be structuring or

11  money laundering.

12  Q.  Okay.  Among materials collected either on May 22nd or

13  October 30th, did you find any payroll stubs for Mr. Gutierrez,

14  any other evidence of -- that would show a legal and documented

15  source for that money?

16  A.  No, sir.  And also, that was not available on May 22nd.  We

17  did look for bills of invoice, anything that was paystub

18  related.  He had told investigators at the time that he was an

19  attorney in Mexico and had served clients here in the U.S.  But

20  we saw nothing to show any type of billable hours or anything

21  that would show revenue from his type of work he does for those

22  individuals.

23        MR. JENKINS:  Okay.  I don't have any further

24  questions at this time.

25        THE COURT:  Thank you.

1     Mr. Dilley.

2          MR. DILLEY:  Yes, Your Honor.  Thank you.

3                    CROSS-EXAMINATION

4  BY MR. DILLEY:

5  Q.  Good morning, Agent Benavides.

6  A.  Good morning, Mr. Dilley.

7  Q.  It's good seeing you again.

8  A.  Yes, sir.  You as well.

9  Q.  Thank you.

10     So I want to go back to May 22nd, 2018.

11  A.  Yes, sir.

12  Q.  Up until that point, you agree that my client had –– at the

13  time that he was detained, my client had not violated any laws?

14  A.  That's correct, sir.

15  Q.  Okay.  And when he was detained, he was not free to leave;

16  is that right?

17  A.  That's correct, sir.  He was read his Miranda warnings.

18  Q.  Okay.  So the only information that you had prior to my

19  client's detention on May the 22nd, 2018, was information

20  relating to his seeking out a .50 caliber rifle; is that right?

21  A.  Along with additional firearms as well.

22  Q.  Okay.  So up until that time, you had already discovered

23  other transactions where my client had purchased weapons?

24  A.  It's unknown if he actually had done the purchases

25  themselves, but he left a digital footprint on that same

1  website that showed his interest in other firearms.

2  Q.  Okay.

3  A.  So we weren't able to see the back end of it, only the

4  solicitation.  And that dated all the way back to November of

5  2017.

6  Q.  Okay.  So as of the time that you detained him on May the

7  22nd, you knew that he was a legal resident?

8  A.  Yes, sir.

9  Q.  You knew that he had a concealed handgun license?

10  A.  Yes, sir.

11  Q.  Okay.  And you'll agree with me that the purchase of a .50

12  caliber, especially the one that's involved in this particular

13  arrest that you made on May the 22nd, was not illegal to

14  purchase?

15  A.  It was not.  And, again, it was not an arrest.  It was a

16  detainment of your client, sir.

17  Q.  Was he handcuffed?

18  A.  He was.

19  Q.  Okay.

20  A.  Yeah.

21  Q.  And how long was he handcuffed?

22  A.  Approximately one hour from the time where he was field

23  contacted, back to our local office, until he was released,

24  about an hour.

25  Q.  So he was not free to leave that entire time of the one

1    hour, in other words?

2    A.  Correct.

3    Q.  Okay.  And was he free to leave when he got to the ATF

4    office?

5    A.  After he decided that he would voluntarily give a

6    statement, I believe he was unhandcuffed, and he was free to

7    leave after that.  We gave him contact information, and that

8    was it.

9    Q.  Okay.

10   A.  Yes, sir.

11   Q.  Now, saying a little bit about myself and others that I may

12   know -- I mean, there's -- you'll agree that a .50 caliber is

13   not necessarily a cheap weapon, right?  It's kind of expensive?

14   A.  I would say so, in my experience, yes, sir.

15   Q.  Okay.  But it's also desired by many gun enthusiasts.  It's

16   like a dream gun to have?

17   A.  I'm not sure of a dream gun, but it is one that's desired

18   if they could afford it.  Yes, sir.

19   Q.  Okay.  And certainly, bolt-action semiautomatic .50

20   calibers for sale in the United States, it's not an illegal

21   act, nor is the purchase of them; is that right?

22   A.  As long as the person that's acquiring it is not prohibited

23   and the person that would be selling it is not prohibited from

24   being able to sell it.  Correct.

25   Q.  Okay.  Now, you mentioned that the ATF CI had engaged in

1  some discussions with my client and that he had made references

2  to people in Mexico that wanted to purchase the .50 caliber,

3  but that sale ended up folding and didn't work out; is that

4  right?

5  A.  Something along those lines, yes, sir.

6  Q.  Okay.  Now, one thing you didn't mention is that –– isn't

7  it true that the confidential informant alluded to my client

8  that –– you know, that the weapon that he was interested in,

9  that it was going to be going down south, and my client said

10  no, it wasn't.  You remember that?

11  A.  I do remember that.

12  Q.  Okay.  So my client expressed this by way of text, or was

13  it –– was it a recorded conversation with the confidential

14  informant, that that was not his intention that this weapon was

15  going to be going down south?

16  A.  I believe that was during a recorded first meeting

17  conversation with your client.

18  Q.  Okay.  Now, these online sites or these private–seller–to–

19  private–buyer transactions ––

20  A.  Yes, sir.

21  Q.  –– you're relatively familiar with how that operates; is

22  that right?

23  A.  Very much so.

24  Q.  Okay.  And you'll agree with me that the private–sale–to–

25  private–purchase is traditionally –– at least if they see each

1   other in person, is traditionally done in cash?

2   A.  Yes, they are.

3   Q.  And the reason is, is because the seller doesn't want to be

4   stuck with a bounced check?

5   A.  Correct.

6   Q.  Okay.  So it was not at all unusual that my client was

7   prepared to pay cash for this particular weapon in this private

8   sale by private seller to a private purchaser?

9   A.  That's correct.

10  Q.  Okay.  And up until that time you didn't have any evidence

11  to indicate that that $10,000 that he was going to utilize to

12  purchase this weapon came from an illegal source?

13  A.  No, he did not.

14  Q.  Okay.  And he had two -- he had two weapons that were

15  within his vehicle, as you testified earlier; is that right?

16  A.  That's correct.

17  Q.  Okay.  I believe it was a Ruger .380, and I believe it was

18  a Beretta Brigadier?

19  A.  Something close to that, yes, sir.  A 9-millimeter, yes,

20  sir.

21  Q.  Okay.  And those two weapons were returned to me to get to

22  my client about a couple of months after you had originally

23  arrested him and released him; is that right?

24  A.  Yes, sir.

25  Q.  Okay.  Now, I want to ask you something about that Beretta

1   Brigadier.  Being that you're in ATF, I'm sure you're probably

2   familiar with different gun prices.  But that weapon itself

3   runs somewhere retail around 1,200 bucks.

4   A.  I did not look at the sale or the purchase of that

5   particular gun, so I'd have to take your word.  I'm not sure

6   how much it is.

7   Q.  Okay.

8   A.  Yeah.

9   Q.  Did you ever investigate what the value was of any weapon

10  that you are claiming that my client was illegally purchasing

11  for illegal purposes?

12  A.  Yes.  On some of them we did.  And that had to do with the

13  transactions that were on his cellphone.

14  Q.  Okay.

15  A.  Not the two that you're referring to that were in that

16  vehicle.

17  Q.  Okay.

18  A.  Yes, sir.

19  Q.  Well, there was -- there was -- there was some -- and I

20  remember seeing this.  I was provided this yesterday --

21  A.  Yes, sir.

22  Q.  -- by Mr. Jenkins, that there was some communication when

23  my client was attempting to purchase a Remington pistol --

24  remember seeing some texts exchanged with somebody --

25  A.  Yes, sir.

1    Q.  -- in Mexico?

2    A.  Yes, sir.

3    Q.  And in there -- in there as well was a reference to a

4    Beretta and --

5    A.  Okay.

6    Q.  -- that the Beretta was about 1,200 bucks.

7    A.  Okay.

8    Q.  Okay.  Did you ever attempt to find out whether that was

9    the retail value for that Beretta?

10   A.  No.  Because when you just say "Beretta," we don't know

11   which Beretta.  We don't know what make or model that could be.

12   So just saying "Beretta," there's a low-end and there's a

13   high-end Beretta.  So no, there wasn't anything we could have

14   followed up on for that.

15   Q.  So you didn't follow up on the weapon that was returned to

16   my client to find out approximately how much that was, to see

17   if maybe perhaps it was the same Beretta that had the same

18   retail value, during that text conversation with someone in

19   Mexico?

20   A.  Again, there was no model number.  So it was unknown if

21   that's the same gun --

22   Q.  Okay.

23   A.  -- being referred to.

24   Q.  Okay.  In one of the reports that I got involving the

25   purchase of a Remington 9-millimeter by my client --

1    A.  Yes, sir.

2    Q.  -- it talked about how he purchased it for 900.  Do you

3    remember that?

4    A.  I do remember that transaction.

5    Q.  Do you know whether that was a reasonable retail purchase

6    value?

7    A.  Again, unless there was a model number, just saying that it

8    was a Remington 9-millimeter, I wouldn't be able to really

9    estimate the price, if that's good -- you know, high or low or

10   right on -- you know, right on target.

11   Q.  Okay.

12   A.  Yeah.

13   Q.  So with regards to that report of investigation, which I

14   believe is Number 14, it makes reference to the Remington, a

15   Sig Sauer and a Beretta.

16   A.  Yes, sir.

17   Q.  And you indicate in your report that he seemingly offers it

18   for sale to someone else?

19   A.  Yes, sir.

20   Q.  Okay.  Now, when you say "seemingly," you'll agree with me

21   that that text thread doesn't once mention the word, that I'm

22   going to sell it to you or anything to that effect.  It just

23   mentions the value of those two or three weapons?

24   A.  Correct.  And he's holding himself out to -- would be a

25   seller of that.  And that was the amount that he's asking for

1    or discussing that would be the purchase of.  That's why I say

2    "seemingly."

3    Q.  Okay.  Well, seemingly –– tell me what it was within that

4    thread of texts that indicates that he was selling any of those

5    three pistols to anyone else.

6    A.  Well, what ends up happening with that particular firearm,

7    a Remington 9-millimeter, is that there was an individual by

8    the name of Andrew Callies that we did identify as being the

9    person that he was communicating with.  That individual was

10   already known to ATF on a prior investigation already.  He was

11   an unlicensed dealer using Texas Gun Trader, and he was selling

12   to individuals who were taking those firearms –– or ultimately

13   selling them, and they were ending up in Mexico, different

14   parts.  So he was communicating with already somebody who was

15   on an ATF investigation.

16       So based off of that information, knowing that Mr. Callies

17   purchased the firearm because there was a paper trail, and then

18   looking at when your client was communicating with him, and

19   then looking at when the gun was actually recovered in Mexico,

20   and then seeing your client talk to an individual named Rafael

21   Figueroa-Partida, it's a good –– a good linear timeline of

22   events showing that that transaction had passed through your

23   client's hands and ended up in Mexico.  That's where we're

24   making that ––

25   Q.  And any of those firearms were located in Mexico?

1   A.   Yes, they were.

2   Q.   Which one?

3   A.   That particular one had -- the Remington 9-millimeter, it

4   was in Ciudad Victoria, Tamaulipas, Mexico, that particular

5   one.

6   Q.   Okay.  And, again, you didn't check to see whether any of

7   the value that my client indicated in the text thread to anyone

8   in Mexico, whether in fact that was actually the amount that he

9   paid for those weapons?

10  A.   My experience is, too -- without knowing that, is there's a

11  profit built into that, right?  So if there's a firearm that

12  buys here in the U.S. for 500, your client may be asking 700,

13  for his profit of $200.  So there could very well be a profit

14  in that amount that's being texted because we don't know what

15  the model is on there.  So he could already have a profit built

16  in there.  And I would argue the same thing, for you to say

17  that there's not a profit built into it, you would also have to

18  say that you would need to know specifically what kind of gun

19  it is.

20  Q.   That's right.  So it could be either way.  It could be

21  that -- for example, there was a value in the text thread that

22  indicates 1,200 for the Beretta --

23  A.   Yes, sir.

24  Q.   -- but we don't know what the actual value of that Beretta

25  is.  It could be up to 1,200.  It could be less.

1   A.  That's correct if you're looking at the portion of the

2   unlicensed dealing of a firearm.  But if you're looking at this

3   transaction from an individual who's a Mexican citizen, which

4   is Mr. Figueroa, and he's communicating on the acquisition for

5   him and disassembling firearms on his behalf, then you're

6   looking at a different charge.  You're looking at a smuggling

7   charge.  And so it's irrelevant, looking at the unlicensed

8   dealing, on what the profit was.

9   Q.  You'll agree that none of those three weapons was it ever

10  discussed that Mr. Figueroa or anyone else was going to

11  purchase those weapons?

12  A.  Which three, sir?  I'm sorry.

13  Q.  The Remington, the Beretta or the Sig Sauer.

14  A.  The Remington, there was discussion, and a Sig Sauer was

15  discussion.  But what was not discussed were the two that were

16  in the vehicle.  Now, that could have been the Beretta that was

17  being referred to, the one in the vehicle.  But we did not feel

18  that there was reason to believe it was.  And that's why your

19  client ended up getting that firearm back.  We didn't feel like

20  he was engaging with that person to sell that particular one.

21  Q.  So you didn't have -- in other words, you didn't have any

22  serial numbers on those three weapons that was in that text

23  thread?

24  A.  I believe not -- yes, correct.  And we did not see it

25  anywhere else in the text threads.

1   Q.  Okay.

2   A.  Yes, sir.

3   Q.  As of May the 22nd, 2018, when my client was arrested,

4   detained, however you may call it, there was no evidence that

5   he was engaging in a straw purchase?

6   A.  Not with our informant, no, sir.

7   Q.  You made mention of the fact that you went by my client's

8   residence in San Antonio.  So I want to cover those.  How many

9   days did you go out there and surveil?

10  A.  Approximately three to five instances, and that was

11  probably in June, a couple of occasions in July and in August.

12  So it wasn't continuous.  We call them spot-checks, and that's

13  what we were doing.

14  Q.  Okay.  So three to five somewhere between June, July and

15  August?

16  A.  Yes, sir.

17  Q.  Okay.  And what times of the day did you go by?

18  A.  Mostly during the daytime, sir.

19  Q.  Okay.

20  A.  Yeah.  And when I say "daytime," I mean normal operating

21  between, like I say, 8:00 and 5:00.

22  Q.  Okay.  So business hours?

23  A.  Business hours.  There you go.

24  Q.  Okay.  So it's not at all unusual that someone's vehicle or

25  an individual may not be at home during business hours --

1    A.   It's possible.

2    Q.   –– during the week?

3    A.   Yes, sir.

4    Q.   Okay.  You're not indicating that because of the fact that

5    you were not able to see my client exit the house, enter a

6    vehicle and depart with a vehicle, that he wasn't necessarily

7    not living there at that residence?

8    A.   That's correct.

9    Q.   Okay.  And so the last time that you actually surveilled

10   this house was in August?

11   A.   Some time around then.  And that gave us a different

12   indication during that timeframe.  I believe the house now was

13   posted on an online site, and there was, I guess, like what

14   they call a virtual view, that you could see the residence.

15   And now you could see that the residence no longer had

16   furniture.  It looked lived in.  It looked staged.  So at that

17   point there was a better indication that he may not have –– be

18   living into the residence.

19   Q.   Now, it seems like there's a contradiction there.  You said

20   no longer lived in, but it looks staged.  When it's staged,

21   there's furniture in a house?

22   A.   It is.  And what I mean, that it's staged to sell.  And

23   that doesn't necessarily mean that the owners of the house live

24   while it's staged, so it's being shown to would-be buyers.

25   Q.   And it's going to look like it's clean?

1  A.  With less furniture, correct.  Yes, sir.

2  Q.  Okay.  You're not -- you're not telling the Court here

3  today that my client was not living at this residence all the

4  way up until the time of his arrest in October?

5  A.  It's unknown.  Again, no vehicles there, not seeing him

6  there, the house looking that it's been cleaned out or staged

7  gave us reason to believe that he was no longer in that

8  residence.  Not saying he didn't have ties or communications

9  with that residence, just meant that it did not look like he

10  was residing there.

11  Q.  Okay.

12  A.  Putting his head down.

13  Q.  Have you ever had a home that you've sold that was staged?

14  A.  I did.

15  Q.  Okay.

16  A.  Or I have.

17  Q.  And have you ever sold a home that you were still living in

18  as it was being sold?

19  A.  Yes, sir, I have.

20  Q.  Okay.  And you'll agree that there's a marketability value

21  to making it look clean and look staged?

22  A.  There is.

23  Q.  Okay.  Now, you mentioned something about some license

24  plate hits that were down in the -- towards the Valley; is that

25  right?

1  A.  Yes, sir.  That's correct.

2  Q.  Okay.  Do you know that those photos take a picture of

3  the -- of the driver occupants of the vehicle?

4  A.  That is when there's a border crossing.  On a license plate

5  reader it's a little different.  There is not a photograph if

6  it's not going by one of the cameras.  And what it does is it

7  hits the plate or captures a license plate and just tells you

8  that it crossed.

9  Q.  Okay.

10  A.  And that's what I'm referring to.  And when I say

11  "crossed," crossed a -- crossed an area where the plate reader

12  is, not a land border, not going into Mexico.

13  Q.  Okay.

14  A.  Yes, sir.

15  Q.  So you don't -- you don't know who was actually driving the

16  vehicle?  Could have been my client's wife at the time, who

17  also lived at the house?  You don't know one way or the other?

18  A.  That's true.  And I did say that in testimony earlier.

19  Q.  Okay.

20  A.  Yeah.

21  Q.  And I believe you also testified that my client was

22  actually arrested in this case as he was coming back into the

23  United States?

24  A.  That is correct.  Yes, sir.

25  Q.  Okay.  He has never given you any indication of his intent

1  to flee the United States as a result of this investigation; is

2  that right?

3  A.  I've never spoken to him about his intent, so I'm not sure

4  if there was any or if he left the area after the field

5  contact.  We're not sure.

6  Q.  Okay.

7  A.  I don't know his intention.

8  Q.  You'll agree with me that Mr. Gutierrez hired me and I

9  maintained constant contact with you all the way through

10 October, the same month he was arrested?

11 A.  You and I remained in contact, yes, sir.

12 Q.  Okay.

13 A.  I'm not sure what your communications are with your client.

14 Yes, sir.

15 Q.  Now, when you mentioned, of course, that my client is an

16 attorney in Mexico and you didn't see any evidence of any

17 billable hours, you're not -- you're not indicating that

18 attorneys, when they offer their services, are only for

19 billable hours.  You'll agree that sometimes there's flat

20 rates, flat fees?

21 A.  That is correct.  And oftentimes you'll also see something

22 written down with client information.  He did have legal

23 documentations in the first -- the first field contact on May

24 22nd.  I did see legal documents that were in Spanish.  And I

25 didn't see anything on a client list or business cards or

1  anything like that.  That's what I'm referring to.  No

2  paystubs, amounts for services that he did.  That's what I'm

3  referring to.

4  Q.  Okay.  So on May the 22nd, when he was -- when he was

5  arrested, his cellphone was taken and a thumb drive?

6  A.  There was a cellphone, a thumb drive.  The currency and

7  bank deposit slips or transactions were in the car.

8  Q.  Okay.

9  A.  Yeah.

10 Q.  And all that was taken not with my client's permission.  It

11 was just taken from him?

12 A.  It was seized from the vehicle when we did an inventory of

13 the vehicle, before we could return it back, make sure there's

14 nothing illegal, it was there.  And he did end up getting that

15 stuff back.  Now, the paperwork, he did get that back, along

16 with a briefcase.  The cellphone and the thumb drive, we did

17 secure those and did get a search warrant for that information.

18 Q.  And you got a search warrant for that that same day or how

19 soon thereafter?

20 A.  It was within three to five days that we got the search

21 warrant for his digital devices.  Yes, sir.

22 Q.  Okay.  And so in your review of the thumb drive, you

23 could -- you could tell that my client was actually practicing

24 in the legal profession?

25 A.  There was something related to legal documents.  I'm not

1    quite sure.  I don't read Spanish.  But you could tell that

2    they were formal documents, based off what I see here in the

3    U.S. as far as language.

4    Q.  Okay.  And I was going to ask you that.  You're not --

5    you're not fluent in Spanish, are you?

6    A.  No, sir, I'm not.

7    Q.  Okay.  So any of these texts that were -- or any threads or

8    WhatsApp messages or texts that were in Spanish, it's not

9    something that you could read and understand what it means.

10   You need somebody else to interpret that for you?

11   A.  Yes, sir.  And he is in the court.  Jonathan Morgan with

12   Homeland Security did the analysis on the text communications.

13   Q.  Okay.  You'll agree with me that nowhere is it indicated in

14   your investigation how much my client was supposed to be

15   receiving for supposedly any weapons that were being

16   transported to Mexico for an illegal purpose?

17   A.  I'm not sure.  The quantity, I don't know if it was per

18   firearm.  That wasn't detailed or discussed as far as that

19   percentage.  I don't know.

20   Q.  Okay.  But there's no -- there's no evidence at all that

21   indicates that my client received any kind of profit for the

22   sale of any weapon to anyone in Mexico?

23   A.  That's unknown.  Again, we're looking at these large cash

24   deposits in the bank, so it very well could have been

25   reimbursement for prior transactions he did with the

1    individual, Mr. Figueroa.  So it's unknown.

2        But I could tell you in my training/experience that's

3    suspicious when you're right underneath 10,000, you're putting

4    large cash deposits in.

5    Q.  Okay.  So it could have, but it could have not as well.  It

6    could be either/or?

7    A.  That's right.

8    Q.  Okay.  And besides that one 9-millimeter pistol, that

9    Remington that was located in Mexico that supposedly had some

10   connection to my client, any other weapons besides that pistol

11   that came back to anything having to do with my client?

12   A.  Absolutely.  There was another .50 caliber rifle that

13   Mr. Gutierrez had did a transaction with.  There's an

14   individual who is in the Houston area.  His name is Mr. Gumban.

15   And he had sold a .50 caliber rifle similar to the one that he

16   was attempting to acquire through Texas Gun Trader.  That was

17   sold to him on September 30th of 2017 for $8,000.

18       We've communicated with Mr. Gumban on that transaction, and

19   he's described your client, along with the type of vehicle that

20   was used and where they did that transaction.  That vehicle was

21   ultimately recovered in Reynosa, Mexico.

22   Q.  I didn't hear that.  You said a vehicle or the firearm?

23   A.  Both, the vehicle was -- that we knew your client to drive

24   was identified, along with Mr. Gutierrez.  And additionally,

25   the firearm that was sold by Mr. Gumban to Mr. Gutierrez, that

1   was recovered and -- on August 10th of 2018.

2   Q.  Do you have any evidence to share with us, as to that

3   purchase in September 2017 from Mr. Gumban, whether my client

4   transferred it to someone else here in the United States, and

5   then it made its way to Mexico?  Do you know who it came into

6   possession of?

7   A.  That would be something that Agent Morgan could detail more

8   during the communications with Mr. Figueroa.  That was in

9   Spanish during that text communication.

10  Q.  This is probably the last question I have here.

11  A.  Yes, sir.

12  Q.  In your report of investigation, Number 13, it mentions

13  that my client was selling firearms to unknown clients in

14  Mexico.

15  A.  What was the question, sir?  Selling what?  I'm sorry.

16  Q.  Sure.  Selling firearms to unknown clients in Mexico.

17  A.  Oh, yes, sir.  Okay.

18  Q.  So that's in your report of investigation, Number 13?

19  A.  Yes, sir.

20  Q.  Okay.  So you agree that these unknown clients, meaning you

21  don't have -- based on that statement, you don't know whether

22  they're connected -- these clients are connected or not

23  connected at all to any drug organization in Mexico?

24  A.  Again, Mr. Morgan would be able to detail that.  And I

25  think you'll hear his testimony say that that was confirmed,

1   and a particular cartel will be named.

2   Q.   Okay.  Well, the report of investigation, Number 13,

3   indicates to unknown clients in Mexico.  Do you remember the

4   date that that was authored?

5   A.   You talking about the text communication between --

6   Q.   The report.

7   A.   Again, you'll have to refer to Mr. Morgan.  But that is

8   documented in later reports.  Yeah, maybe not that particular

9   one, 13, but later on it is documented.

10  Q.   Okay.

11  A.   Yes, sir.

12  Q.   But you authored report Number 13?

13  A.   Yes, sir.

14  Q.   And at least when you authored that, it was your belief

15  that the clients in Mexico were unknown?

16  A.   They are.  They were at that time.  They become later on

17  known as we started looking at the cellphone information.  Yes,

18  sir.

19          MR. DILLEY:  Pass the witness, Your Honor.  Thank you.

20          THE COURT:  Mr. Jenkins.

21          THE WITNESS:  Thank you, Mr. Dilley.

22          MR. JENKINS:  Just a couple of points very briefly.

23                     REDIRECT EXAMINATION

24  BY MR. JENKINS:

25  Q.   Agent Benavides, counsel started out by asking you to agree

Christopher Benavides – Redirect                37

1   that on May 22nd Mr. Gutierrez had not at that time violated
2   any laws to your knowledge; is that right?
3   A.  Yes, sir.
4   Q.  Okay.  Based upon followup investigation, isn't it true
5   though that the grand jury indicted Mr. Gutierrez for a
6   conspiracy to smuggle goods from January -- starting in January
7   2017 up until May 22nd?
8   A.  That was correct.
9   Q.  And he was indicted for conspiracy to possess a firearm in
10  relation to a drug trafficking crime, again, that conspiracy
11  from 2017 until the date of his arrest on May 22nd?
12  A.  That also is correct.  Yes, sir.
13  Q.  Okay.  So your conclusion that he had -- or your statement
14  that was elicited that he had not committed any crime as of May
15  22nd, that was based upon the information known to you and
16  provable by you as of that date, correct?
17  A.  Correct, just looking at it underneath a particular
18  one-time incident on that date.  Now, with the totality of
19  what's known on the case, that shows to be different.
20  Q.  Okay.  And with regard to Mr. Gutierrez' presence in that
21  residence, following his detention on May 22nd --
22  A.  Yes, sir.
23  Q.  -- at the time of his arrest were there some documents
24  found that reflected either a lease or a rental of another
25  residence here in San Antonio?

1    A.  I believe that actually had come from the second arrest,

2    the one that was in October, that there was something related

3    to a neighborhood up in Stone Oak, Arrowhead, something like

4    that, where he may have been leasing or renting another house

5    during the time when the other one was for sale.

6    Q.  Okay.

7    A.  Yeah.  So --

8    Q.  But following the May 22nd incident, did you ever see his

9    white -- I'm sorry -- Honda Accord or the Yukon associated with

10   him present at the -- at the residence in Stone Oak?

11   A.  No, sir, nor the -- nor the white Accord.  At the time I

12   believe he had been in a vehicle accident, and it had sustained

13   some damage, and he had a rental car at the time.  So that was

14   the car that we had seen show up on May 22nd.

15   Q.  Okay.  But you never saw that car back at the Stone Oak

16   residence --

17   A.  No, sir.

18   Q.  -- after May 22nd?

19   A.  Not at the times that I had mentioned to Mr. Dilley about

20   the surveillances we went out there.

21   Q.  Okay.  That's all.  Thank you.

22   A.  Yeah.

23        MR. DILLEY:  Just one question, Your Honor.

24

25

```
 1                      RECROSS-EXAMINATION
 2   BY MR. DILLEY:
 3   Q.  Agent Benavides --
 4   A.  Yes, sir.
 5   Q.  -- my client doesn't have any prior arrests besides this
 6   case; is that right?
 7   A.  Not that I'm aware of here.  Well, actually, he did have an
 8   arrest.  I believe you'd have to look at pretrial services.  I
 9   believe it was for an unlawful entry at one point.  It was a
10   while back.  And I think that was dismissed, and he still ended
11   up getting his legal permanent residence.
12   Q.  Okay.  Thank you.
13   A.  Yes, sir.
14           MR. DILLEY:  Nothing further, Your Honor.  Thank you.
15           THE COURT:  Anything else for this witness?
16           MR. JENKINS:  No.
17           THE COURT:  You may step down.
18           THE WITNESS:  Thank you, Your Honor.
19           MR. JENKINS:  I call Agent Jonathan Morgan.
20       (The oath was administered)
21           JONATHAN MORGAN, GOVERNMENT'S WITNESS, SWORN
22                       DIRECT EXAMINATION
23   BY MR. JENKINS:
24   Q.  Good morning, sir.  Will you state your name and occupation
25   for the record, please.
```

1    A.   Good morning.  My name is Jonathan Morgan.  I'm a special

2    agent with Homeland Security Investigations.

3    Q.   And how long have you been so employed?

4    A.   Since the formation of Homeland Security, but I've been in

5    federal law enforcement since 1991.

6    Q.   Okay.  Are you one of the other primary case agents in the

7    Gutierrez matter?

8    A.   Yes, sir.

9    Q.   Okay.  As part of the followup investigation, were you able

10   to check Homeland Security databases to determine whether or

11   not vehicles associated with Mr. Gutierrez were regularly

12   crossing back and forth between the U.S. and Mexico?

13   A.   Yes, sir.  Since January of this year, he crossed at least

14   20 times from the U.S. into Mexico and returned.

15   Q.   Okay.  Was someone with your agency also tasked with

16   looking at the bank accounts that were reflected in bank

17   deposit slips seized on May 22nd in assessing whether -- what

18   sort of activity had been associated with those bank accounts?

19   A.   Yes, sir.  In reference to the encounter on the 22nd and

20   the pocket trash referenced by Agent Benavides, we were able to

21   identify seven bank accounts associated with Mr. Gutierrez.  In

22   those seven bank accounts, from January of 2018 through October

23   of this year when the subpoenas were served, there was

24   $113,000 -- approximation, $113,000 of credits associated with

25   those seven aggregate accounts.  Of those credits, 67 percent

1  were solely cash deposits.

2  Q.  Okay.  And were any of the cash deposits in an amount above

3  $10,000 that would trigger a reporting requirement under

4  federal law?

5  A.  No, sir.  In fact, they were all under 10,000 and showing

6  characteristics commonly known with structuring, as Agent

7  Benavides alluded to.  There was also evidence that on one

8  single day there was multiple deposits under the threshold

9  amount at different financial institutions.

10 Q.  Okay.  And at this -- at the same institution would there

11 be in the course of a few days multiple cash deposits that

12 totaled over 10,000 but were broken down into smaller amounts?

13 A.  Yes, sir.

14 Q.  Did HSI perform the extraction of information from the

15 iPhone seized on May 22nd?

16 A.  Yes, sir.

17 Q.  Did the contents of that iPhone reflect a number of

18 instances where Mr. Gutierrez made inquiries about buying guns?

19 A.  There was well over a hundred communications, either

20 through SMS, commonly known as a text message, or Facebook

21 instant messaging with sellers from Texas Gun Trader and

22 Mr. Gutierrez, communicating about the purchase of a certain

23 type of firearm.  Analysis of those communications, we deduced

24 that there was approximately 70 completed transactions.

25 Q.  Okay.  Let me back up.  Were there only a hundred

1  communications, or were there communications regarding a

2  hundred different guns?

3  A.  There was over a hundred communications.  Sometimes the

4  communications were a single gun.  Some of them were multiple

5  guns --

6  Q.  Okay.

7  A.  -- at a transaction.

8  Q.  And you said, analyzing the contents of the phone,

9  approximately how many of those gun deals were ultimately

10 completed?

11 A.  It appears there was at least 70.  There could be a little

12 bit more, but at least 70 guns appeared to have been completed.

13 Q.  Among the communications found on the phone, were there --

14 in addition to communications between gun sellers and

15 Mr. Gutierrez, were there parallel communications between

16 Mr. Gutierrez and people using Mexican telephone numbers?

17 A.  Yes.  Using the WhatsApp application with the Mexican

18 number affixed to the actual WhatsApp, I guess, identifier for

19 the person, Mr. Figueroa was identified, that was alluded to by

20 Agent Benavides, and another subject in Mexico as well,

21 inquiring about these guns.

22 Q.  Okay.  Agent Benavides mentioned a couple of guns that were

23 subsequently recovered in Mexico.  Were there at least two of

24 the firearms among that 70 plus that Mr. Gutierrez purchased

25 that were subsequently recovered by law enforcement in Mexico?

1    A.   Yes, sir.

2    Q.   And was one -- well, which --

3    A.   They referenced the Remington 9-millimeter --

4    Q.   Yes.

5    A.   -- and the .50 caliber, the Barrett .50 caliber rifle.

6    Q.   Okay.  Now, the .50 caliber, that's not the gun that was --

7    that was the discussion leading up to May 22nd, correct?

8    A.   No, sir.

9    Q.   Was this a .50 caliber that had been purchased previously?

10   A.   Yes, sir.

11   Q.   Okay.  And when was that gun purchased?

12   A.   I don't recall the dates.  Agent Benavides alluded to them.

13   But that was the Gumban purchase.

14   Q.   Okay.  And the gun that Mr. Gutierrez purchased from

15   Mr. Gumban was later, after the purchase, recovered in Mexico?

16   A.   Yes, sir.

17   Q.   In the course of those discussions between Mr. Gutierrez

18   and the Mexican buyers, the ultimate buyers, was there ever any

19   discussion of how the guns were going to be smuggled across the

20   border?

21   A.   There was talk about -- from Mr. Gutierrez to Mr. Figueroa

22   asking how are these going to get over, and Mr. Figueroa says,

23   Well, I'll take care of that aspect.  And there was some talk

24   of disassembling firearms.  In my experience, I worked on the

25   border for 11 years, I know firearms being smuggled to Mexico

1    are disassembled to be hidden within secret compartments prior

2    to being smuggled across.

3    Q.   Okay.   And were there discussions about Mr. Gutierrez going

4    down to the border area to turn the guns over to other people?

5    A.   Yes, sir.

6    Q.   But he wouldn't carry them across the border.   He would

7    deliver them to someone else?

8    A.   From what I saw on the communications, I believe they were

9    handed over to somebody who would physically take possession

10   and be in charge of physically smuggling the firearm to Mexico.

11   Q.   Okay.   In the course of these -- the conversations that

12   were recorded on Mr. Gutierrez' phone, did he and one of the

13   Mexican buyers ever discuss the use of these guns by a Mexican

14   drug cartel?

15   A.   Yes, sir.

16   Q.   And when did that conversation occur?

17   A.   I'm not sure of the date, sir.   I apologize.   But

18   Mr. Figueroa did send a link to a Mexican blog referencing two

19   factions within the Gulf Cartel were fighting each other for

20   control of the Matamoros plaza.   Matamoros plaza is just a

21   region of Matamoros, Mexico, where if -- it's a corridor where

22   drugs are coming into the country and contraband and proceeds

23   are going back to Mexico.

24        The conversation revolved around several of the members

25   within the two different factions.   One faction was aligned to

1  the old Osiel Cardenas regime, and they were his nephews who

2  were vying for continued control of the -- of the plaza, and

3  another faction that had splintered off within the same cartel

4  who were attempting to gain control.

5  Q.  Okay.  In the course of that conversation did the Mexican

6  buyer and Mr. Gutierrez talk about how they had provided guns

7  to the cartel that was involved in this conflict?

8  A.  Yes, sir.  They referenced a subject by the name of JR, or

9  Juniorito, as being the ultimate recipient of the firearms, and

10 that the fact that he should fare well in these skirmishes, in

11 these battles because they had supplied him very well with

12 firearms.

13 Q.  Okay.  And did they mention specifically the .50 cal. that

14 had been supplied?

15 A.  They did mention a .50 cal. and reported it had --

16 Mr. Figueroa reported had seen it being used in the skirmishes.

17 Q.  Okay.  And so Mr. Gutierrez was -- acknowledged that the

18 .50 cal. he had bought had been supplied to this cartel who was

19 now battling it out in Matamoros?

20 A.  Correct.  In one communication I do recall that the

21 subject, I believe the one they reference as JR, sent them

22 photos of bullet holes in his vehicle and referencing that he

23 had actually come under fire.  I'm assuming from one of these

24 skirmishes.

25          MR. JENKINS:  Okay.  I don't have any further

1    questions, Judge.

2              THE COURT:  Thank you.

3         Mr. Dilley.

4              MR. DILLEY:  May I proceed, Your Honor?

5              THE COURT:  Uh-huh.

6                        CROSS-EXAMINATION

7    BY MR. DILLEY:

8    Q.  Good morning, Agent Morgan.

9    A.  Good morning, sir.

10   Q.  You were not part of the investigation of my client as of

11   May 22nd, 2018, and prior to that; is that right?

12   A.  I was present at the operation on May 22nd, yes, sir.

13   Q.  Oh, you were?

14   A.  Yes, sir.

15   Q.  Okay.  So it was you and Agent Benavides that were there

16   present?

17   A.  Yes, sir.

18   Q.  Okay.  So you heard him testify earlier that my client was

19   taken into custody.  Did you handcuff him, or did he handcuff

20   him?

21   A.  He was handcuffed by another agent.  I know I did not.

22   Q.  Okay.  And the approximate amount of time that Agent

23   Benavides stated that my client was handcuffed and not free to

24   leave, as far as the amount of hours, does that sound about

25   right to you?

Jonathan Morgan - Cross                           47

1  A.  From the time he was encountered, for safety purpose

2  handcuffed, and transported to the ATF offices, whatever that

3  time was.  I could imagine an hour or two.

4  Q.  You're saying he was -- he was handcuffed during that

5  entire time for safety purposes?

6  A.  Well, at the time he was encountered, there was firearms in

7  his car.  Then for transport.  I'm sure it's ATF's policy, as

8  it is with us, to maintain somebody handcuffed for safety

9  purposes.

10 Q.  Okay.  Those two weapons that were located within his

11 vehicle, they weren't given to him during the transportation

12 back to the ATF office; is that right?

13 A.  No, sir.

14 Q.  They remained in one of the law enforcement official's

15 custody?

16 A.  That's correct.

17 Q.  All right.  So there was no longer a fear that my client

18 posed a danger in relation to those two weapons while he was

19 handcuffed?

20 A.  In reference to weapons, no, sir.

21 Q.  Okay.  And you'll agree with me -- well, let me ask you,

22 prior to May 22nd, 2018, when -- do you remember more or less

23 when it was that you became part of this investigation?  Was it

24 you first or ATF or both --

25 A.  No.  ATF brought the lead information to me.

1   Q.  Okay.  Would it have been sometime that same month?

2   A.  It would have probably been a little bit earlier.  Maybe

3   April -- March/April timeframe.

4   Q.  Okay.  And you'll agree with me that at least with regards

5   to your involvement, as of the time that my client was detained

6   on May the 22nd, 2018, he had not committed any violation of

7   law?

8   A.  At that time we did not know that he had committed any --

9   didn't have any knowledge of him violating any federal laws.

10  Q.  Okay.  Now, at the time that you did some of this research

11  as far as the $113,000 in credits that went to seven different

12  bank accounts, you already knew that my client was a licensed

13  attorney in Mexico?

14  A.  Yes, sir.

15  Q.  Okay.  And you're familiar with the fact that attorneys can

16  be paid in cash?

17  A.  I'll take your word for that.  I would assume that could be

18  a process of payment, being paid in cash.

19  Q.  Okay.  And certainly by my client's deposits, as you

20  mentioned 67 percent of the $113,000 credits in cash, that's

21  certainly not indicative of my client's attempt to hide money;

22  is that right?

23  A.  I can't say that at this point.  That's still -- the

24  investigation's still ongoing, and we're still evaluating and

25  analyzing the bank information.

Jonathan Morgan - Cross                    49

1   Q.  Okay.  But you'll agree, though, that if it's deposited, if
2   cash is deposited into an account, that is not an indication
3   that you're trying to hide that cash.  That's now purview to
4   subpoena and review by banks, of the fact that cash was
5   deposited?
6   A.  I can't say that I agree with that statement, especially
7   when on one given day, you know, an amount totaling $18,000 was
8   broken up into lesser amounts under the threshold and
9   deposited, same day, in two different financial institutions.
10  So I can't say that I agree with that assessment.
11  Q.  As of right now, you don't have any evidence whatsoever
12  that indicates the source of those funds that were deposited?
13  A.  No, sir.
14  Q.  Okay.  Now, you mentioned something about 70 --
15  approximately 70 completed transactions involving guns.  Were
16  they all here in the state of Texas?
17  A.  Yes, sir.
18  Q.  Okay.  And out of those 70, did you investigate whether my
19  client turned around and sold them to someone else in the
20  United States that didn't appear to you to be illegal?
21  A.  We looked at the timeline on each of those.  And, again,
22  this is an ongoing investigation, so we're still looking at it.
23  It's a -- it's a lot of data to go through and to assimilate.
24      We were looking at the timeline, the chain of events, when
25  he was purchase -- if there was communications with the Mexican

1    counterpart and if the guns were being recovered in Mexico.  So

2    we're still looking at that avenue.

3        To answer your question directly, are we looking to see if

4    he sold these guns in the United States?  No.

5    Q.  Okay.  All told, how many weapons are you saying, that my

6    client purchased here in the United States, made their way over

7    into Mexico?  How many do you have proof of?

8    A.  I believe -- I know for sure two.  I think there's another

9    two in the investigation that were recovered that we can show

10   chats where Mr. Gutierrez completed that purchase.  So maybe

11   four.

12   Q.  When you say "completed that purchase," are you referencing

13   to pistols?

14   A.  Pistols and -- I'll say firearms in general.  I'm not sure

15   if it's a handgun or an actual long gun.

16       And when I say "completed," I know that they're completed

17   because Mr. Gutierrez would text, I've arrived.  I'm driving a

18   white Honda and I'm parked in such and such a location.

19       So one can infer from that communication, which was in the

20   English language, that they met and the firearm was

21   completed -- the firearm sale was completed.

22   Q.  And I get that.  And what you're referring to is his

23   purchase of firearms here in Texas?

24   A.  Correct.

25   Q.  Okay.  But what I'm asking you is, is that out of those

1   more or less 70 completed transactions, right now you're

2   stating that you believe that you've got evidence that

3   indicates two of those weapons were later discovered in Mexico?

4   A.   The evidence will support at least two, maybe four, went to

5   Mexico.   I personally believe all the guns went to Mexico.

6   Q.   I know that's your personal belief, but do you have any

7   evidence to support that belief?

8   A.   At this point just the ones you referenced, the two to four

9   firearms.

10  Q.   Did you discover anything in your investigation that my

11  client made any kind of profit with regards to any weapons that

12  were sold in Mexico?

13  A.   There was communication with Mr. Figueroa in reference to

14  the pricing.   And we have these at -- and I say "we."   It

15  was -- they came to an agreement that they were going to be

16  priced at a certain amount.   That would cause me to infer that

17  there was a profit margin in the sale of these guns --

18  Q.   But what you're --

19  A.   -- in Mexico.

20  Q.   And what you're referring to specifically, the one time

21  that any value was on any text thread between my client and

22  Mr. Figueroa had to do with that Remington, the Sig Sauer and a

23  Beretta; is that right?

24  A.   There was communications -- when I say a "timeline," I'm

25  referencing to the solicitation from Texas Gun Trader to the

1    time they met and completed the transaction, where Gutierrez

2    then talks to Figueroa about that particular gun, whether he

3    attaches a photo of the gun or he says, I have the gun.  I'm

4    going down to the border.

5        Now, there was other transaction -- other communications

6    where Gutierrez is talking to Mr. Figueroa about guns and

7    pricing where I can't find the first half of the timeline,

8    where the gun was purchased from a private seller from Texas

9    Gun Trader.  And I can say that -- I can say that I haven't

10   done it -- completed that yet, that transaction because we're

11   still working.  But we don't have those serial numbers, so we

12   can't trace it and find out who the original purchase is at

13   this time based on the pictures.  Some of the pictures are

14   grainy.  Some of them didn't show the serial number when the

15   photo was taken.

16   Q.  With regards to that Remington 9-millimeter and the .50

17   caliber, do you have any evidence one way or the other that

18   indicates who my client actually sold those weapons to?

19   A.  I'm sorry.  Can you repeat that?

20   Q.  Do you have any evidence that indicates who my client sold

21   those weapons to, the 9-millimeter Remington or the .50 caliber

22   that was located in Mexico?

23   A.  The 9-millimeter Remington, there is a completed text

24   thread with that purchase, where it was purchased from

25   Mr. Callies and provided to Mr. Figueroa in the sense that,

1   Yes, I'll take that one.  He -- Mr. Figueroa told them, I will

2   take that gun.

3   Q.  And can you tell me -- can you tell me how that was

4   expressed; that, Yes, I'll take that gun?

5   A.  I'd have to refer to the communication itself.  But it was

6   in the Spanish language, and I am fluent in Spanish.

7   Q.  Okay.  Are you referring to the report of investigation,

8   Number 14, where there's -- where there's talk of that

9   Remington?

10  A.  Yes, sir.

11  Q.  Okay.  Would you like to see it to refresh your memory?

12  A.  Please.

13          MR. DILLEY:  Okay.  May I approach, Your Honor?

14          THE COURT:  Yes.

15          THE WITNESS:  In reference to the Remington, from

16  "Ojitos" to -- or Mr. Figueroa to the -- to Gutierrez -- I'm

17  sorry.  This is a little grainy here.  *Manda las otros dos*."

18  The .38 -- *"el treinta ocho Remington.  Van esas dos*."  This is

19  from Mr. Figueroa to Mr. Gutierrez.  *"Si esa ya.  Faltan las*

20  *otras dos*."  In other words, I'm missing the other -- I still

21  need the other two.

22          MR. JENKINS:  Okay.

23          THE WITNESS:  And then Mr. Gutierrez says, Okay.

24  BY MR. DILLEY:

25  Q.  Didn't he -- wasn't he sending photos?  And when he says

1    *"mandame esas dos*," couldn't that equally indicate to send the

2    photos of the weapons that my client just purchased?

3    A.   I believe he did send the photos.

4    Q.   Okay.  But how do you know that that means that those

5    weapons were going to be sold to Mr. Figueroa?

6    A.   Mr. Figueroa's in Mexico.  Mr. Gutierrez is here.  And he's

7    telling him -- Mr. Figueroa's telling Gutierrez *"faltan los*

8    *otros dos*."  I mean, one can infer that they're transacting

9    firearm sales.

10   Q.   *"Faltan los otros dos*," doesn't that mean that there's two

11   more needed or two more missing?

12   A.   Two more needed.

13   Q.   Okay.  But that could also mean two more as far as photos?

14   A.   But I believe in that text string photos were sent of the

15   guns.

16   Q.   After the fact, after they were requested?

17   A.   I don't believe so.  Let me look at this here again.  I

18   don't know if you -- here's a cutout from the extraction

19   report.  "These JPEGs are the photos of the guns."

20   Q.   And then --

21   A.   And that was done before this interaction about the other

22   two -- we still need the other two.

23   Q.   And you'll agree with me that later on in that text thread

24   there's more photo images that are sent?

25   A.   Yes, sir.

1  Q.  Okay.  And so could it not equally be the fact that my

2  client is responding to send me the other two, meaning send him

3  the other two photos?

4  A.  I would need to see the actual photos.  I know they were

5  attached on my report.

6  Q.  Okay.  But right now, one way or the other, you don't know

7  when those photos were sent, either before or after that text?

8  A.  I would need to see the photos.

9          MR. DILLEY:  Okay.  May I approach, Your Honor?

10          THE COURT:  Yes.

11  BY MR. DILLEY:

12  Q.  Do you have any evidence in your investigation that

13  indicates who my client ever turned any weapons over to that

14  you say were connected to Mexico?

15  A.  I have a -- there was a communication between Mr. Figueroa

16  and Mr. Gutierrez in reference to waiting for somebody to come

17  across the bridge.  Again, in my experience, especially with me

18  working with the U.S. Customs service along with the border --

19  synonymous with somebody coming across to pick up the firearms,

20  which they talked about disassembling them, putting them in

21  another -- a vehicle to be smuggled across into Mexico.

22  Q.  When you're talking about disassembling them, you're not

23  referring to my client disassembling any weapon?

24  A.  I believe there was communications where he references

25  disassembling the firearms.

1    Q.  That my client was actually engaged in disassembling the

2    firearms?

3    A.  Yes, sir.

4    Q.  And do you remember what date that occurred?

5    A.  No, sir.

6    Q.  But that's within your report somewhere?

7    A.  I have to reference the report, but I think I do allude to

8    that communication.

9    Q.  And do you have access to that report right now?

10   A.  I have to refer to Mr. Jenkins.  I think it's the report

11   that talks about -- in generalities, about the communications,

12   summarizes them in general.

13              MR. JENKINS:  Okay.

14              THE WITNESS:  It's probably just a -- going to be hard

15   to find in that --

16              MR. DILLEY:  Is that report Number 27?  You want to

17   look at 27, maybe?

18              MR. JENKINS:  Okay.  Yeah.  And I'll give you the ATF

19   version of this report.

20              THE WITNESS:  Okay.  There --

21              MR. JENKINS:  May I approach the witness, Your Honor?

22              THE COURT:  You may.

23              MR. JENKINS:  And just, if I may do voir dire.

24

25

```
 1                    VOIR DIRE EXAMINATION
 2   BY MR. JENKINS:
 3   Q.  Were your reports incorporated into ATF reports --
 4   A.  Yes, sir.
 5   Q.  -- verbatim?
 6   A.  Yes, sir.
 7   Q.  I'm going to show you ATF report Number 27.  Does that
 8   reflect some of the analysis of the phone?
 9   A.  Yes, sir.
10         MR. JENKINS:  Okay.
11         THE WITNESS:  I'm going to read the excerpt from the
12   report.  "In a WhatsApp communication dated 12/31/2017
13   Gutierrez" and Figueroa -- "asked Figueroa how he was going to
14   cross the firearm.  Figueroa advised Gutierrez he would tell
15   him how.  Gutierrez then advised Figueroa that he disassembled
16   the Mossberg.  Figueroa mentioned they would reassemble said
17   firearm in Mexico."
18                 CROSS-EXAMINATION (CONTINUED)
19   BY MR. DILLEY:
20   Q.  All right.  So then -- that's Figueroa telling my client as
21   to how he does something?
22   A.  Correct.
23   Q.  Okay.  That's not indicating that my client is doing
24   something, disassembling?
25   A.  Well, Mr. Gutierrez advised that he had disassembled the
```

1    firearm.  And Mr. Figueroa says, We'll reassemble it here in

2    Mexico.

3        I think a reasonable law enforcement officer would infer

4    that that firearm was disassembled for a smuggling venture into

5    Mexico and reassembled for sale in Mexico and use in Mexico.

6    Q.  Did you -- did you review any of the legal documents, the

7    legal work that my client was engaged in with regards to

8    anything that was confiscated from him?

9    A.  Can you be more specific --

10   Q.  Yeah.

11   A.  -- in regard to legal documents?

12   Q.  You'll agree that documents that were confiscated from him

13   by way of thumb drive, phone or otherwise had legal paperwork

14   in Spanish.  You agree with that?

15   A.  There were some documents that looked like civil-type

16   documents in reference to properties in Mexico.

17   Q.  Okay.

18   A.  I didn't go into depth on reading the whole -- the whole

19   document because you could readily see that it wasn't involving

20   firearms.

21   Q.  But it certainly indicated that my client was engaged in a

22   legal practice?

23   A.  All it showed me, that he had these documents that were

24   some form of Mexican government documents.

25   Q.  You don't know one way or the other whether he was engaged

1   with regards to the practice of law with regards to those

2   documents that you discovered?

3   A.  No, sir.  I just know that he stated he was a practicing

4   attorney in Mexico.

5   Q.  You'll agree that there are no undercover informants or

6   witnesses that can verify any of what you're claiming as far as

7   any weapons transferred to someone in -- by my client?

8   A.  We can only draw inferences from our investigation.

9   Q.  And the inferences come by way of text messages; is that

10  right?

11  A.  Phone tolls, text messages, Facebook, instant messages and

12  the communications on the first -- the undercover transaction,

13  because in that transaction the photos of those firearms that

14  the undercover was selling to Mr. Gutierrez were actually

15  forwarded to Mr. Figueroa.

16  Q.  On May the 22nd, when my client was detained, there was no

17  arrest warrant or search warrant; is that right?

18  A.  At that particular time, no, sir.

19  Q.  Okay.  And, again, just to make sure I'm clear on this, my

20  client was not free to leave when he was detained?

21  A.  No, sir.

22  Q.  Okay.  So you'll agree that my client was arrested for this

23  offense as he was coming back to the United States?

24  A.  Yes.

25  Q.  In your investigation you haven't uncovered anything that

1   would indicate that my client intends on fleeing the
2   United States while these charges remain pending?
3   A.   I can't speak to his intent, sir, with reference to his
4   desire to flee or remain in the United States.
5   Q.   Okay.  You have no documents or any evidence to share with
6   us that would indicate that one way or the other?
7   A.   No, sir.
8           MR. DILLEY:  Okay.  I'll pass the witness, Your Honor.
9   Thank you.
10          THE COURT:  Mr. Jenkins?
11          MR. JENKINS:  Nothing else, Judge.
12          THE COURT:  Okay.  Thank you.
13      You may step down.
14          THE WITNESS:  Thank you, Your Honor.
15          MR. JENKINS:  That's all we have at this time.
16  * * *
17      (End of excerpt at 11:34 a.m.)
18
19
20
21
22
23
24
25

1                                    –oOo–

2          I certify that the foregoing is a correct transcript from

3     the electronic sound recording of the proceedings in the

4     above–entitled matter.

5

6     Date:   12/19/2018        /s/ Chris Poage
                                655 East Cesar E. Chavez Blvd., Suite G–65
7                               San Antonio, TX   78206
                                Telephone:   (210) 244-5036

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25